Filed 10/10/14  In re A.S. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re A.S. et al., Persons Coming Under the Juvenile Court Law. | B254460 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>APRIL S.,<br><br>        Defendant and Appellant. | (Los Angeles County Super. Ct. No. DK01314) |

APPEAL from the orders of the Superior Court of Los Angeles County.  Emma Castro, Juvenile Court Referee.  Affirmed.

Cristina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Denise M. Hippach, Deputy County Counsel, for Plaintiff and Respondent.

\* \* \* \* \* \* \* \* \* \*

Mother April S. appeals from the juvenile court's jurisdictional findings under section 300, subdivision (b) of the Welfare and Institutions Code[1] as to her now nine-year-old daughter A.S. and eight-year-old son N.S. She also challenges the dispositional findings and orders, contending the Los Angeles County Department of Children and Family Services did not meet its burden of providing clear and convincing proof of the need to remove the children from her custody. Mother contends there was insufficient evidence the Department made reasonable efforts to prevent removal, or that there were no alternative means to protect the children.

Because mother does not challenge the juvenile court's jurisdictional findings as to father, who is not a party to this appeal, we find that her challenge to jurisdiction is nonjusticiable. And, in any event, mother's claims fail on their merits, as there was substantial evidence that mother's drug use put the children at risk. We also find substantial evidence supports the juvenile court's removal order, and therefore affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On August 30, 2013, the Department received a referral, reporting that the family had no food. According to the reporting party, the motel room where the family lived was cluttered, and there were only chips and an open box of macaroni to eat. Moreover, mother's teeth looked black, although mother denied any drug use. On September 5, a Department social worker spoke with a staff member at the motel. According to the staff member, mother often did not take the children to school, and walked the streets with them until 1:00 or 2:00 a.m. Maternal grandmother, who also lived with the family, frequented the motel rooms of known drug users. The staff member had also seen the children begging for money on the street corner. On a daily basis, male visitors came in and out of the family's motel room, especially at night.

On September 9, a social worker made an unannounced home visit and met with mother. The motel room was cluttered with nonhazardous household items. The family

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

had food as mother had recently gone grocery shopping. Mother denied any past or current drug use, and claimed her teeth were rotten because she drank a lot of soda and did not brush her teeth. Mother admitted she and maternal grandmother begged for money to buy food at the end of the month. Mother acknowledged she was wasteful with her money and food stamps, and that the family often ran out of money to buy food by the end of the month. Mother had not visited a food pantry in more than a year, but sometimes received food donations from churches that delivered food to the motel.

Mother denied having male visitors in the motel room, and denied keeping the children out until 1:00 or 2:00 a.m. Mother admitted she and maternal grandmother would sometimes argue, and that mother would leave with the children to "just walk around on the streets and purchase items at the local gas station." They would return to the motel room no later than 10:45 p.m.

Mother had not taken A.S. to the dentist in several years, and then seven-year-old N.S. had never been to the dentist. The children also had no annual medical exams for several years.

A.S. reported that mother would walk around on the streets with her and her brother until 1:00 or 2:00 a.m., even on school nights. They would just walk around and buy things from the store. Mother and maternal grandmother would ask people for money in parking lots; mother would purchase french fries for the children with the money she obtained from strangers. A.S. denied that she or her brother begged for money. According to A.S., the family sometimes did not have any food to eat.

A.S. told the social worker that mother's boyfriend, Edward, would "talk" with mother in the motel room bathroom. A.S. did not know what mother and Edward were doing in the bathroom. Mother reported that she and Edward had stopped seeing each other months earlier, but A.S. had seen Edward only a few days before.

A.S. saw maternal grandmother smoke something in the bathroom, but was unable to provide additional details because mother would use her body to block the children's view of the bathroom. The room smelled strongly of cigarettes, and the social worker

3

saw an ashtray on the nightstand. The social worker counseled the family about the dangers of secondhand smoke.

N.S. provided the same information as A.S. He also told the social worker that the family sometimes did not have food, and that he went hungry.

Mother signed a safety plan agreeing not to take the children out late at night, to use her food stamps wisely so the family always had food, and to drug test. Mother also agreed to complete a mental health assessment, after the social worker observed that mother did not comprehend the seriousness of keeping the children out late and not using her food stamps wisely.

Initially, maternal grandmother also agreed to drug test, but she refused to participate in a test when the social worker arrived to transport mother and maternal grandmother to the testing facility on September 10. When mother arrived at the facility, she initially refused to test, claiming she was unable to "pee in a cup." Mother eventually completed a test, and that test was positive for methamphetamine.

When confronted with her positive test, mother denied any drug use. She told the social worker that the Department was harassing her. "[E]ven though mother's rotted front teeth suggest that mother may be a long [term] user of methamphetamine," mother denied that she used drugs. Mother also claimed that maternal grandmother is "thin" because she is diabetic, and not because she is a drug user.

Notwithstanding her agreement to manage her food stamps wisely, on September 24, mother reported that she had to recycle cans and bottles in order to buy food for the children.

On September 25, the juvenile court signed a removal warrant for the children. When mother was served with the warrant, she tried to explain her positive drug test by telling the Department she had been around someone that was smoking methamphetamine.

Father, S.S., was unable to take the children because of his current living situation. He had no concerns about mother's care for the children, and did not believe she used illegal substances.

4

The October 1, 2013 detention report recited that "[r]easonable [e]fforts were made to prevent or eliminate the need for the child(ren)'s removal from the home. The following Pre-placement Preventative Services were provided but were not effective in preventing or eliminating the need for removal of the children from the home. [¶] CSW Vallejo assessed whether the children could safely remain in the home with father. However, father stated that he was unable to take the children at this time. [¶] CSW Vallejo assessed whether the children could remain in the home with mother. Due to mother's apparent drug use and current neglect of the children, it appears that the children cannot safely remain in the home with mother." As for services that could prevent further detention and facilitate the return of the children, the Department identified the following: "Counseling, Case Management, Parent Training, Transportation, Other Services. [¶] Mother to complete a drug [treatment] program to include random and on-demand drug testing. Mother to complete a psychiatric/psychological examination and follow the recommendations. Parents to complete a Parenting Education Program."

At the October 1 detention hearing, mother's counsel argued that "Mother doesn't believe there's been reasonable efforts to prevent detention. She indicates she's interested in a testing referral, she's interested in drug court, and she would like the children placed with her should she be admitted to a program. Mother indicates that had she been aware of these options, she would have considered them prior to detention." The juvenile court found prima facie evidence for detaining the children, that there were no reasonable means to protect the children other than removal, and that the Department had made reasonable efforts to prevent removal. The children had been placed in separate foster homes, so the juvenile court ordered the Department to "use best efforts" to place them together, and in the meantime, to provide sibling visitation.

In an October 21 last minute information for the court, the Department reported that the children were unable to stabilize in their foster homes "due to mother discussing inappropriate matters with [them] during telephone . . . calls." Mother had encouraged the children to scream, kick, and yell so they could come home sooner. On October 10,

5

A.S. had to be re-placed because of her behavior in her foster home. On October 13, A.S.'s new foster parent sought removal of A.S. from her home because of mother's inappropriate remarks during monitored telephone calls. Mother told A.S. that a child involved with the Department had died, promised A.S. that she could come home before Halloween, and encouraged A.S. to miss her friends and family. Also, when A.S. excitedly told mother that her new foster mother was going to braid her hair, mother told A.S. "I don't want that woman's hands in your hair."

On October 15, N.S.'s foster parents asked that N.S. be removed from their home, because he did not listen, would not take showers, would not change his clothes, and hit and kicked other children in the home. His behavior was more aggressive after phone calls with mother. Moreover, N.S. told the foster mother that he was going to "act bad" in each placement so he could go home sooner.

The Department spoke with mother repeatedly about her inappropriate comments to the children, but mother either denied that she was inappropriate with the children, or claimed that she did not understand the difference between appropriate and inappropriate subjects. Therefore, on October 16, the Department terminated mother's telephone contact with the children.

The Department reported that mother refused to participate in a mental health assessment, and also refused transportation funds.

On November 5, 2013, the Department filed a first amended petition including new allegations as to father. The petition newly alleged that father had a history of alcohol abuse and mental health issues, and that he physically abused the children by striking them with belts.

The Department's November 12 jurisdiction/disposition report disclosed that the Department had received two previous referrals for the family. In August 2012, the Department received a referral that mother failed to receive follow-up care for a fracture to N.S.'s wrist. The referral was deemed unfounded. In February 2013, the children had reported that mother was prostituting herself in the family's motel room while the children were present, and that she made the children touch men's penises. A.S. was

6

shown a video on mother's mobile phone of mother having sex with a man. This referral was also deemed unfounded.

On October 25, A.S. told a Department Investigator that mother did not use drugs, but father "drinks all the time" and "thumps" her and her brother. When father would arrive drunk for visits with the children, maternal grandmother would tell him to leave. Father would "whoop[]" the children with his belt.

On October 30, mother told a Department Investigator that the day before her drug test, she helped a neighbor move, and the neighbor gave her a soda that did not "taste right." She believed the neighbor had slipped her drugs because she does not "do drugs so that is the only thing [she] could think of." Mother believed she had been set up by the motel's manager. When the investigator suggested that mother submit to another random drug test, mother stated "No, I don't want to take another test because I didn't do anything wrong. If it's a court order then I will take it."

Maternal grandmother told a Department Investigator that the day before mother drug tested, she had helped some neighbors move. After mother helped them, she was "talking real fast" and said a drink the neighbors gave her "tasted funny." Maternal grandmother believed the neighbors were friends with the motel manager, and that "[t]his is a straight trap" because mother did not drink or do drugs. According to maternal grandmother, the office manager of the motel is angry at the family because a sink overflowed in their room. Therefore, maternal grandmother believed they were "set up" by the manager and mother was slipped drugs.

Maternal grandmother admitted to a history of smoking marijuana, but claimed it had been three years since she last used. She refused to drug test because she had to watch the children. Maternal grandmother smoked cigarettes in the bathroom because it has a vent and it is too cold to smoke outside. Maternal grandmother has resided with mother and the children since the children were born, and mother is her caretaker.

The Department reported the following "reasonable efforts": "Mother was offered random drug tests[;] [¶] Placement services for the children[;] [¶] Children referred to the HUB[;] [¶] Children referred for MA assessments[;] [¶] Mother, father, [A.S.] were

7

interviewed for the Jurisdictional report."

On November 12, father signed a waiver of rights and entered a no contest plea to the amended petition, which included amended allegations that he has an unresolved history of alcohol abuse, used inappropriate discipline, and has a history of untreated mental health issues.

A contested jurisdictional and dispositional hearing as to mother was held on November 22. The October 1 detention report, November 5 first amended petition report, November 12 jurisdiction/disposition report, and October 21 last minute information for the court were admitted into evidence.[2]

The Department called mother as a witness under Evidence Code section 776. Mother disputed the results of her drug test. Concerning her drug test, mother told a Department Investigator "[t]hat I must been the plan because I had right now the situation I'm in, I'm in a motel and we and the manager had been feuding and he and the social worker came from my mother elder and he did not like it because of the fact was been going on with my mother, and I can do more damage to you and can to me and he said after they see her they're going to come after me and I was like well it was why she come after me and my mother calls me and she wants to call for the person and do not deal with me and he was upsetting me and I said I don't care and he said okay."[3]

Mother believed she tested positive because the motel manager set her up. Mother's neighbor, Preston, might have slipped drugs in mother's soda, when she helped him move at the end of August. Mother only had two sips of soda, because it tasted bad. Mother denied telling the social worker she had been around someone smoking methamphetamine. Mother was asked to show her teeth to the court, and she complied. Mother also denied that there were only chips and an open box of macaroni when the Department visited her motel room. She denied roaming the streets with the children late

---

[2] It appears that the "November 5" and "November 12" reports are the same report, which was dated November 12, but filed on November 5.

[3] Much of mother's testimony was rambling and hard to understand.

at night, or that they missed school. Mother did not "beg" for money, but once or twice asked strangers for 50 or 60 cents. Mother denied that she was given an opportunity to submit to another drug test after her positive test. However, she later admitted that she was asked to submit to another drug test, but refused to do so because she wanted to come to court first.

During cross-examination, mother pointed out that A.S. was only eight years old, and that A.S. must have been confused when she told the Department that she stayed out until 1:00 or 2:00 a.m. Mother also denied encouraging the children to act out in their foster placements.

The hearing was continued so that the Department could report on its efforts to place the children together in a foster home, and to report whether the children were participating in counseling. Mother was asked if she was willing to submit to a random drug test, and she said she was; however, it does not appear that she ever submitted to a test.

On November 25, N.S. was interviewed by a Department Investigator and reported that mother did not smoke, and that his family "always had food. We ate rice with hot sauce, spaghetti, soup, all that kind of stuff. My dad told my social worker that we didn't have any food and that's not true. He just wants to spend time with our mom and have us be away for a little bit."

Mother failed to appear at the continued hearing on December 18. Mother's counsel argued that one positive test did not suggest a drug history. The Department argued that mother was in denial about her drug problem, and that there was evidence suggesting a history of drug use, such as her neglect of the children's medical and dental needs, failure to provide adequate food, and her failure to regularly take them to school. Also, mother had refused to take another drug test when given the opportunity.

The court concluded that mother had agreed to participate in drug court and to drug test at the detention hearing; "however, the mother failed and has not participated in random and on demand drug testing since that detention hearing on October 1st. So to the extent we're . . . unable to confirm positive or negative tests, it's the mother's failure

9

to participate in the court orders that disallowed the court from having that information available. But based on information in the detention report and the circumstances delineated in the juris dispo report for family, the court does believe that mother is a current user of methamphetamine. . . ." The court sustained the following allegation in the petition, as to mother:

> "[Under section 300, subdivision (b),] the children [A.S.] and [N.S.'s] mother . . . has a history of illicit drug use, and is a current user of methamphetamines, which renders the mother incapable of providing regular care of the children. On 09/10/2013, the mother was under the influence of methamphetamines, while the children were in mother's care and supervision. On 09/10/2013, the mother had a positive toxicology screen for methamphetamines and amphetamines. Such illicit drug use on the part of the mother endangers the children's physical health and safety and places the children at risk of physical harm and damage."

The juvenile court also concluded there was clear and convincing evidence under section 361, subdivision (c) that "there's a detriment or risk if the children are returned home to the physical health and safety and protection and emotional and physical well being of the children and there is no reasonable means for the children to be protected without removal . . . ." The court also concluded that "[r]easonable efforts were made to prevent or eliminate the need for removal . . . ."

This timely appeal followed.

## DISCUSSION

Mother contends the jurisdictional findings under section 300, subdivision (b) are unsupported. Mother also contends that insufficient evidence supported the removal of the children. We disagree, finding the adequacy of jurisdiction is nonjusticiable, as mother does not challenge the jurisdictional findings as to father. In any event, substantial evidence supports the juvenile court's jurisdictional and dispositional orders.

1. **Substantial Evidence Supports the Juvenile Court's Jurisdictional Findings**

Mother challenges the jurisdictional findings based on her drug use, contending that her single failed drug test is insufficient to support jurisdiction. Rather, she contends that her "struggle to secure food, shelter and medical/dental care" are the "trappings of

10

what befalls every family in the lowest socio-economic bracket . . ." and the children were removed due to her poverty rather than the consequences of her drug use.

Because mother does not challenge the jurisdictional findings as to father, mother's challenge to jurisdiction based on her drug use is nonjusticiable. (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1490-1491; see also *In re Jonathan B.* (1992) 5 Cal.App.4th 873, 875 ["[A] reviewing court may affirm a juvenile court judgment if the evidence supports the decision on any one of several grounds"].)

In any event, mother's claims fail on the merits. There was ample evidence that mother suffered from a serious drug problem that negatively affected her ability to safely parent the children. Mother's positive drug test, unstable lifestyle, physical appearance, and rambling testimony all supported an inference of an ongoing drug problem. Mother was in denial about her drug problem, first claiming her positive test resulted from exposure to second-hand methamphetamine smoke, and later claiming she was slipped drugs by her neighbor as part of a conspiracy with the motel manager. Mother had neglected the medical and dental needs of the children, kept them out on the streets at all hours of the night, and often did not have enough food for them to eat because she did not properly manage the family's food stamps. Contrary to mother's contention, these parental deficiencies are not merely indicia of poverty, but are strong indicators of a substantial and continuing drug problem that put the children at substantial risk of harm.

## 2.     Substantial Evidence Supports the Juvenile Court's Dispositional Findings

Mother contends the Department did not meet its burden of proof for removal of the children, as it did not provide the court with any evidence that reasonable efforts were made to prevent the removal of the children, or that there were no reasonable means to protect the children other than removal. Moreover, mother contends the juvenile court did not state the facts supporting its conclusion that removal was necessary, and that there was no "clear and convincing" evidence that A.S. and N.S. were in danger in their mother's care.

A child may not be removed from a parent or guardian unless there is clear and convincing evidence of "substantial danger to the physical health, safety, protection, or

physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or guardian's physical custody." (§ 361, subd. (c)(1).) A juvenile court's removal order is reviewed under the substantial evidence standard of review, notwithstanding the evidentiary standard used at trial. (*In re Heather A.* (1996) 52 Cal.App.4th 183, 193; see also *In re E.B.* (2010) 184 Cal.App.4th 568, 578 ["The clear and convincing standard was adopted to guide the trial court; it is not a standard for appellate review. [Citation.] The substantial evidence rule applies no matter what the standard of proof at trial."].)

California Rules of Court, rule 5.690(a)(1)(B)(i) requires the Department to include in its report to the court a "discussion of the reasonable efforts made to prevent or eliminate removal . . . ." Section 361, subdivision (d) requires the juvenile court to "make a determination as to whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor from his or her home . . . . The court shall state the facts on which the decision to remove the minor is based." Rule 5.695(e) also requires the juvenile court to make findings as to whether reasonable efforts were made.

Mother likens this case to *In re Ashly F.* (2014) 225 Cal.App.4th 803 (*Ashly F.*), where the appellate court reversed a disposition order for lack of substantial evidence because the record included no discussion of reasonable efforts by the Department. (*Id.* at p. 809.) The mother physically abused her children and, following the detention hearing, she moved out of the family home where the father and children remained. (*Id.* at pp. 806-807.) The Department's report merely stated there were no " 'reasonable means' " by which the children could be protected without removal and that " 'reasonable efforts' " were made to avoid removal, without explaining what efforts were made. (*Id.* at p. 808.) The juvenile court made no inquiry into the " 'reasonable efforts' " by the Department, and its order simply parroted the Department's assertion it made reasonable efforts to avoid removal. (*Ibid.*)

The appellate court concluded the "[Department] and the court committed prejudicial errors in failing to follow the procedures mandated by the Legislature and the

Judicial Council for determining whether the children needed to be removed from their home." (*Ashly F.*, *supra*, 225 Cal.App.4th at p. 810.) The errors were deemed prejudicial because there was a "reasonable probability" the juvenile court would have concluded that removal was not required, had it inquired into the Department's claim that there were no reasonable means to protect the children. (*Id.* at p. 811.) Mother had already left the family home, and father had completed parenting classes. The juvenile court could have found the Department could adequately protect the children by making unannounced home visits. (*Id.* at p. 810.)

This case is distinguishable. The reports concerning mother and the children revealed that mother was offered a mental health assessment, and an opportunity to drug test further after submitting a dirty test, and she refused to do either. Moreover, mother signed a safety plan agreeing to properly manage her food stamps, but failed to do so, leaving her without money to feed her children.

At the combined jurisdiction and disposition hearing, the juvenile court found mother had agreed to drug test and participate in drug court, but had later refused to drug test. Under these circumstances, the juvenile court made an adequate record of findings that the Department offered services to mother to avoid removal, but that removal was necessary to protect the children. Mother was in denial about her drug problem which apparently contributed to her neglect of the children's basic needs for nutrition, health care, and education. There was substantial evidence that mother refused the services offered to her, and there was no reason to infer that if she were offered any other or different services, the children could have safely remained in her custody.

## DISPOSITION

The orders are affirmed.

GRIMES, J.

We concur:

BIGELOW, P. J.          RUBIN, J.

13